Stephen CONTE, Plaintiff,

v.

DEPARTMENT OF the NAVY, Defendant.

Civ. A. No. 91–194.

United States District Court, D. New Jersey.

Jan. 25, 1991.

As Amended Feb. 13, 1991.

Raymond A. Brown, Alan Bowman, Brown, Brown & Kologi, Newark, N.J., for plaintiff.

Michael Chertoff, U.S. Atty. by Jerome L. Merin, Asst. U.S. Atty., Newark, N.J., and Lieutenant Commander Richard T. Evans, JAGC, U.S. Navy, Judge Advocate General's Corp., U.S. Navy, for defendant.

## OPINION

WOLIN, District Judge.

Plaintiff Stephen J. Conte, a radiologist and a Captain in the Medical Corps of the

United States Naval Reserve, requests that this Court preliminarily enjoin the United States Navy from assigning him to serve as a radiologist in the Persian Gulf. Plaintiff's motion will be denied.

## I. BACKGROUND

On August 22, 1990, President Bush authorized the Secretary of Defense "to order to active duty units and individual members not assigned to units, of the Selected Reserve." Executive Order 12727 of August 22, 1990, "Ordering the Selected Reserve of the Armed Forces to Active Duty." The President authorized this call-up based on his determination that it was "necessary to augment the active armed forces of the United States for the effective conduct of operational missions in and around the Arabian peninsula." *Id.*

Plaintiff is a member of the Selected Reserve and is based at the Naval Reserve Readiness Center, Kearny, New Jersey. Plaintiff's Navy medical records for 1988 and 1989 do not indicate any eye trouble or treatment. On August 24, 1990, Michael Harris, M.D., a retinologist, examined plaintiff. Administrative Record 41. Dr. Harris advised plaintiff, due to "his family history of macular disease[,] ... to avoid direct sun exposure." *Id.* On December 4, Hadley Phillips, D.O., an ophthalmologist, examined plaintiff. *Id.* 22.[1] Dr. Phillips stated that since plaintiff's initial visit to him in June of 1988, he "has complained of continual photophobia causing ocular pain, especially in instances where he interprets x-rays on the view box." *Id.* Dr. Phillips stated that since 1988 he had advised plaintiff to wear tinted glasses and avoid exposure to bright lights and sunshine. *Id.* Phillips recommended that plaintiff be "further examined by a Retinal Specialist." *Id.*

On December 8, 1990, plaintiff went to Commander Thomas Materna, Medical Corps, United States Naval Reserve, for a medical examination at the Naval Reserve Readiness Center, Kearny, New Jersey.

Dr. Materna is an ophthalmologist. During that evaluation plaintiff told Commander Materna that he had a strong family history of macular degeneration. Plaintiff described various symptoms, including some blurring and distortion of his vision, which were consistent with degeneration of the macula. Plaintiff also presented letters from private ophthalmologists concerning his condition. Administrative Record 6–7.

Utilizing an ophthalmoscope, Dr. Materna examined plaintiff's eyes and noted some fine macular changes and a lesion in his left eye. He concluded that plaintiff had good vision but had a macular lesion; complained of increasing visual difficulty; described the symptomology of progressive macular degeneration; and indicated that there was a strong family history of degeneration. *Id.* Because this was a borderline case, an ophthalmological consult was prepared for a second opinion concerning plaintiff's physical qualifications. *Id.* Commander Materna made a provisional recommendation that plaintiff was not physically qualified to be retained in the Naval Reserve. *Id.*

The Commanding Officer, Naval Reserve Readiness Center, Kearny submitted plaintiff's case for review of "Fitness for Retention in the United States Naval Reserve" to Commander, Naval Military Personnel Command via Commander, Naval Reserve Readiness Command Region FOUR and Chief, Bureau of Medicine an Surgery on December 11, 1990. The Commanding Officer included both the medical examination form completed by Dr. Materna and the letters from Dr. Harris and from Dr. Phillips concerning plaintiff's medical condition. Administrative Record 34–42.

On December 20, before a second opinion was issued from a Navy doctor, plaintiff underwent examination by two private physicians. Mark Goldfarb, M.D., an ophthamologist, after considering plaintiff's complaints of blurred vision and family history of macular degeneration, diagnosed "Solar

---

1. Like Dr. Harris, Dr. Phillips reported his examination of plaintiff in a letter addressed "To Whom it May Concern."

Retinopathy left eye greater then [sic] right" and "Macular drusen right eye." Administrative Record 23. Dr. Goldfarb advised plaintiff to stay out of the sun and avoid direct sun exposure, and to wear ultraviolet glasses "full time while outdoors." *Id.* Bradford Liva, M.D., a retinologist, discussed his similar, though more detailed, diagnosis with plaintiff and "strongly advised that Dr. Conte avoid exposure to direct sunlight, wear ultraviolet protective eyewear at all times, take Zinc, Vitamin E, Selenium and Vitamin C supplements daily and to monitor his central vision with an Amster grid daily to monitor for any progression of the disease, especially in the right eye." [2] Administrative Record 20.

Another private retinologist, Donald Green, M.D., Ph.D., examined plaintiff on January 9, 1991, before any Navy doctor rendered a second opinion. Dr. Green's diagnosis of macular degeneration was typical, although he did offer a prognosis that "any progression of the condition could produce significant and irreversible loss of central vision, especially in the left eye. Exposure to bright sunlight is one possible cause for progression of the macular degeneration...." Administrative Record 18.

Lieutenant Commander M. Fitzmaurice, Medical Corps, USN, examined plaintiff on January 11, 1991. Administrative Record 33. Dr. Fitzmaurice, an ophthalmologist, concluded that there were macular changes in both eyes from a possible scar from an insult, *i.e.,* solar burns, but that plaintiff's visual function was good. *Id.* He discussed plaintiff's case with Captain John Sutphin, Medical Corps, USN, the advisor to the Surgeon General for Ophthalmology. They both concluded that plaintiff was fit for duty and deployment. *Id.*

Based upon Fitzmaurice's examination and conclusions, Commander, Naval Reserved Readiness Command Region FOUR, on January 16, 1990, forwarded a recommendation to retain plaintiff in the Naval Reserve. The Commander enclosed the results of the ophthalmological consultation in his endorsement. On January 17, 1991, the Bureau of Medicine and Surgery reviewed all the material submitted in plaintiff's case and concluded that he was physically qualified for all duties consistent with grade and designator.[3] Administrative Record 31–32.

On January 16, plaintiff was called up for active duty and told to report on January 19. On January 17, Commander, Naval Military Personnel Command assigned plaintiff Physical Risk Classification "A" based on the information contained in the letter from Chief, Bureau of Medicine and Surgery. Physical Classification "A" means that he is physically qualified for assignment to or retention in the Naval Reserve and all duties consistent with his grade and designator. Administrative Record 29–30.

On January 18, 1991, plaintiff filed this action and requested an order to show cause for a preliminary injunction. At that time, the parties entered into a consent order requiring plaintiff to report for processing as directed by the Navy. The Navy was to "provide an examination of plaintiff by a specialist in ophthalmology." That same day, Dr. Liva wrote the Navy to state that his evaluation and the evaluations of Drs. Harris, Green and Shakin "concur in that Dr. Conte's retinal damage would be worsened by unnecessary exposure to sunlight and ultraviolet radiation." Administrative Record 16. Dr. Liva also stated that he felt that plaintiff's proposed assignment to the Persian Gulf "would expose him to undue and excessive amounts of ultraviolet light and would greatly accelerate his Macular Degeneration. This would undoubtedly cause progressive and permanent deterioration in his vision." *Id.*

On January 20, plaintiff was examined by Commander George Miller, Medical Corps, United States Naval Reserve, who is an ophthalmologist. Dr. Miller did not

---

**2.** Dr. Liva, like Dr. Goldfarb, wrote a letter "To Whom it May Concern," although Dr. Liva also addressed his to the Navy.

**3.** Designator refers to the professional qualifications of a Naval officer.

mention macular degeneration in his examination report. He did find retinal pigment epithelial defects, which "may be solar induced." Administrative Record 5. He recommended that plaintiff "may wear UV filtering sunglasses." *Id.* On January 22, Donald Hauler, Medical Corps, USN, Bureau of Medicine and Surgery, reviewed and considered the record discussed *supra,* including the letters from private physicians, and declared plaintiff qualified for all duties consistent with rank and designator. Dr. Hauler noted the consistency of the findings and recommendations of Drs. Fitzmaurice and Miller, but did not mention the findings or recommendations of Dr. Materna or any of the private physicians. He expressly considered the difference in qualifications between an ophthalmologist and a retinologist.

## II. DISCUSSION

The Court has jurisdiction over this case under one or more of the following grants of jurisdiction: the Administrative Procedure Act, 5 U.S.C. § 701; mandamus, 28 U.S.C. § 1361; and habeas corpus, 28 U.S.C. § 2241. The Court will not deny plaintiff's motion for a preliminary injunction for failure to state one or more of these basis of jurisdiction as required by Federal Rule of Civil Procedure 8(a)(1). Plaintiff has already moved to amend his complaint to allege APA and mandamus jurisdiction. While that motion is not now before the Court, 28 U.S.C. § 1653 permits the amendment of defective allegations of jurisdiction at any time. Despite claiming that the Navy has violated his substantive due process right to personal security and safety, plaintiff has not alleged federal question jurisdiction under 28 U.S.C. § 1331. However, the Court will not insist on technical compliance with Rule 8(a)(1) where the complaint alleges facts that would confer jurisdiction. *Davis v. Ohio Barge Line,* 697 F.2d 549, 552 (3d Cir. 1983.)

At the oral argument on plaintiff's preliminary injunction motion, counsel for plaintiff proffered testimony by Dr. Materna, Dr. Liva, one of plaintiff's radiologist colleagues, and plaintiff himself. The Court declined to hear this testimony. The Court views itself primarily as reviewing an administrative record; to the extent it reviews the record, testimony is both unnecessary and inappropriate. Plaintiff has also raised a substantive due process claim; as discussed below, this claim is virtually indistinguishable from the administrative review which the Court has performed. Therefore, the Court declined to hold an evidentiary hearing on plaintiff's motion for a preliminary injunction.

### A. *Administrative Review of the Navy's Determination that Plaintiff is Physically Qualified*

■ There are two possible levels of administrative review: first, whether the Navy acted within its discretion and authority; and second, whether it acted arbitrarily and capriciously. In *Byrne v. Resor,* the Third Circuit Court of Appeals held that "it is not [its] function to review the discretionary judgment of a military officer made within the scope of his or her authority." 412 F.2d 774, 775 (3d Cir.1969) (citing *Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953); *Smith v. Resor,* 406 F.2d 141 (2d Cir.1969); *United States ex rel. Schonbrun v. Commanding Officer,* 403 F.2d 371 (2d Cir.1968), *cert. denied,* 394 U.S. 929, 89 S.Ct. 1195, 22 L.Ed.2d 460 (1969)). In *Byrne,* the Court of Appeals refused to interfere with an Army physician's decision that plaintiff, a reservist, was fit for active duty where the plaintiff's private physician disagreed. *Id.* Plaintiff was activated, in accordance with an Army regulation, because he was absent from drill five times within a year. 412 F.2d at 775. The fifth absence was remarkable because plaintiff was actually present; however, he was not wearing a belt, and this deficiency, under another Army regulation, constituted a technical absence. *Id.* Plaintiff argued that this "absence," which occurred within five months of the end of his term of enlistment and subjected him to two years of active duty, constituted arbitrary, capricious and unreasonable conduct by the Army. *Id.* The Court of Appeals refused to review

this "discretionary judgment," and refused on "similar[ ]" grounds to interfere with the judgment of the Army physician that plaintiff was fit for active duty. *Id.*

In this case, as in *Byrne*, determination of plaintiff's fitness was both discretionary and authorized. Navy officers determined that plaintiff was physically qualified for active duty. Macular degeneration, plaintiff's condition, is "cause" for rejection from induction into the Navy. U.S. Navy, *Manual of the Medical Department*, 15–14(e)(2) (1980) (hereinafter, *Manual*). However, "[m]edical examiners should interpret the standards [such as macular degeneration] with discretion and should not construe them too arbitrarily." *Id.* 15–4. The manual also provides:

(1) *In general, the physical standards contained in this chapter* are to be interpreted as applicable only to initial entry into the Navy ..., and *should not be utilized as a basis for finding a member not physically qualified....* A member ordinarily is considered fit for duty unless there is a physical disability ... which interfere[s] with the performance of the duties which the member may reasonably be expected to perform by virtue of grade or rating. Each instance must be based on the relevant facts, and a determination of fitness or unfitness must depend upon the individual's ability to perform the duties of grade or rating in such manner as to fulfill reasonably the purpose of the member's employment on active duty.

(2) Once a member has been ... commissioned, such factors as: (a) inability to meet the standards for initial service; ... (c) inability to physically qualify for specialized duty—are not to be used as a basis for considering a member not physically qualified....

(3) After a member has been ... commissioned, such member will not be declared unfit for naval service because of disabilities which existed at the time of acceptance for naval service and (a) which have remained essentially in degree since acceptance and (b) have not interfered with the member's performance of effective naval service. Under such circumstances, the property of initial acceptance into the naval service of an individual who did not meet entry physical standards is not at issue.

(4) Members who are considered temporarily or permanently unfit for duty should be referred to a medical board for disposition. For further guidance and information refer to SECNAVINST 1850.3 series, the Disability Evaluation Manual (SECNAVINST1850.4), and Chapter 18 of this Manual.[4]

Subpart 15–7 (emphasis added). The page containing these provisions was attached to Dr. Hauler's declaration of plaintiff's physical fitness.

Thus, the standards in the *Manual* are not necessarily applicable to a determination of the physical fitness of someone, such as plaintiff, who has already been commissioned. *Id.* 15–7(1). To the extent the standards are applicable, they are discretionary. *Id.* 15–4. To the extent the standards are not applicable, a naval officer's determination of physical fitness is also discretionary. *See Byrne*, 412 F.2d at 775 (Army physician's determination of fitness discretionary; no discussion of standards). Therefore, the Court finds that the determination of plaintiff's physical fitness was a discretionary one.

■ The determination of plaintiff's physical fitness was authorized. Plaintiff argues that the determination could not have been authorized because no Navy retinologist examined plaintiff. However, the *Manual* expressly authorizes an ophthalmologist to examine reservists with macular degenerations:

It is BUMED [Bureau of Medicine and Surgery] policy that statements from optometrists will be accepted on all matters pertaining to eye examinations. *If evidence of disease is reported, then the opinion of an ophthalmologist should be sought.*

\* \* \*

---

**4.** The parties have not provided any of this "further guidance or information."

*Manual,* 51–14(b) (emphasis added).[5]

█ Plaintiff also argues that the Court need not defer to the Navy's ophthalmologists but should consider the conclusions of plaintiff's private retinologists. *Byrne v. Resor,* however, counsels otherwise. Because the determination of physical fitness is authorized, the Court will not consider conflicting conclusions of private physicians. 412 F.2d at 775.

█ The authority cited in *Byrne* also indicates that the reviewability of the Navy's determination is very narrow. In *Orloff v. Willoughby,* the Supreme Court rejected a doctor's habeas corpus challenge to the government's refusal to allow him to administer certain drugs. 345 U.S. at 92, 73 S.Ct. at 539 (1953). The Supreme Court specifically held that the lack of reviewability of the doctor's claim made it pointless for the district court to take evidence on the correctness of the decision. *Id.*

*Schonbrun,* also cited in *Byrne,* concerned a reservist's claim that his call-up would work hardships on his mentally ill wife and on his community, where he taught mentally disabled children. 403 F.2d at 373. The Second Circuit declined to review the Army's denial of his hardship claims. *Id.* at 374–75. The Court rested its refusal to review on the discretion necessarily exercised by the officer, the delay of litigating the claim in the courts, and, despite the "appealing" nature of plaintiff's case, the probability of a flood of unmeritorious litigation. *Id.*

Finally, in *Smith v. Resor,* the Second Circuit followed *Schonbrun* in stating that "purely discretionary decisions by military officials which are within their valid jurisdiction will not be reviewed by this court." 406 F.2d 141, 145 (2d Cir.1969). However, the court went on to find the Army in violation of its own regulations. *Id.* at 145–47. The Third Circuit has likewise held that military orders are not insulated from claims that they are in violation of the military's own regulations. *O'Mara v. Ze-*

*browski,* 447 F.2d 1085, 1087 (3d Cir.1971). However, plaintiff has not identified a military regulation barring his call to active duty.

In *Byrne,* the Court of Appeals declined to review the challenged action under the "arbitrary, capricious and unreasonable" standard urged by plaintiff. 412 F.2d at 775. In *Jorden v. National Guard Bureau,* however, the Third Circuit stated that it "heavily disfavors finding injunctive claims against the military non-reviewable." 799 F.2d 99, 110 (3d Cir.1986) (citing *Dillard v. Brown,* 652 F.2d 316 (3d Cir. 1981)), *cert. denied sub. nom., Sajer v. Jorden,* 484 U.S. 815, 108 S.Ct. 66, 98 L.Ed.2d 30 (1987). Although *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), bars damages claims against military officers for violation of constitutional rights, the Court of Appeals held that *Chappell* does not bar suits for injunctive relief against military officers. *Jorden,* 799 F.2d at 110. Injunction claims are different from damage claims in terms of

the need for military officers' uninhibited decisionmaking, and the threat to such decisionmaking if officers fear personal liability. The threat of personal liability for damages poses a unique deterrent to vigorous decisionmaking. On the other hand, the possibility of an officer may be compelled by a court to *cease applying a particular regulation in an arbitrary manner,* or to reinstate an improperly discharged soldier, poses much less of a threat to vigorous decisionmaking.

*Id.* (citations omitted; emphasis added). Thus, *Jorden* appears to recognize that an arbitrary and capricious standard may govern judicial review of military decisionmaking.

Plaintiff had alleged in *Jorden* that officers of a state national guard suit had conspired to harass and discharge him on the basis of race and in retaliation for the exercise of his First Amendment rights.

---

5. This provision itself is not a standard such that it does not necessarily apply to the post-commission examination of plaintiff. *See supra* discussion of *Manual,* 15–7(1). Standards are

"physical standards," *id.* 15–1, 15–2, *i.e.,* physical criteria for determining fitness. *Manual* provisions other than physical standards are generally applicable.

*Id.* at 102. Thus, the recognition of an arbitrary and capricious standard in *Jorden* is dictum. The guidance provided by this dictum is limited because *Jorden* concerned a peacetime personnel decision, whereas this case, like *Byrne,* concerns a wartime activation decision. The Court of Appeals' consideration of *Orloff,* 345 U.S. 83, 73 S.Ct. 534, did not take this distinction into account in determining the reviewability of a claim. *Dillard,* 652 F.2d at 322. Even though *Orloff* was a Korean–era case and *Dillard* was a peacetime case, the Court of Appeals stated:

> *Orloff* teaches no more than that one exercise of military discretion involving duty assignments will not be reviewed by a court if there has been no statutory or constitutional violation. Indeed, *Orloff* stands for the proposition that a constitutional challenge brought against the military, which does not require a court to run the military, is justiciable.

*Dillard,* 652 F.2d at 322 (citation omitted). *Dillard* itself was a peacetime sex discrimination case, so this broad reading of *Orloff* does not necessarily erase this distinction. However, in light of the Third Circuit's strong disfavor of unreviewability, *Jorden,* 799 F.2d at 110, the Court will review the Navy's determination under an abuse of discretion standard.

 Reviewing the Navy's action under an arbitrary and capricious standard,[6] the Court will not disturb the Navy's action. The gist of plaintiff's procedural claim is that the Navy should have had plaintiff examined by a retinologist, and acted arbitrarily and capriciously by ordering plaintiff to active duty in the Persian Gulf without subjecting him to a retinological examination. At oral argument, counsel for plaintiff argued that the lack of an examination by a qualified specialist would be apparent if, hypothetically, a gynecologist had examined a male reservist after that reservist had complained of a "male" disorder. To state this argument is as much to distinguish it from plaintiff's situation. Plaintiff was not examined by the wrong

specialist, or by a general practitioner, but by a specialist with some knowledge of his condition instead of a subspecialist in that specialty. As discussed *supra,* Navy procedures provide that ophthalmologists examine for a variety of eye-related diseases, including those harming the retina. *Manual,* 15–14. The Navy's enforcement of its regulation was not arbitrary or capricious.

 Even if the Navy's failure to examine a reservist by a subspecialist could constitute arbitrary and capricious conduct in some cases, it does not in this case. Plaintiff's private retinologists have stated that his assignment to the Persian Gulf would be harmful to plaintiff's eyesight. Dr. Materna, the Navy ophthalmologist who provisionally found him physically unqualified, "prepared an ophthalmological consult with the ophthalmology clinic for a second opinion...." Administrative Record 7. Dr. Materna did not state that a retinologist was required; indeed, he stated that macular degeneration is "regularly diagnosed by ophthalmologists." *Id.* 6. After Dr. Materna's examination, Dr. Fitzmaurice examined him and consulted with Dr. Stuphin. Then, on January 18, 1991, the day before plaintiff was due to report, the parties consented to an order directing the Navy to provide plaintiff with a third ophthalmological examination. Plaintiff did not ask the Court for a retinological examination and expressly consented to an ophthalmological examination. At some time after that, plaintiff requested that the Navy provide a retinological examination and the Navy refused. This refusal was not arbitrary or capricious.

### B. *Substantive Due Process*

 Plaintiff claims that the Navy has violated his substantive due process right to personal security and safety. Plaintiff's Reply at 3 (citing *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *Val-*

---

**6.** The Court assumes that plaintiff intended a due process claim by invoking this standard. This is an assumption necessary to plaintiff's

argument, because only constitutional claims are reviewable. *Orloff,* 345 U.S. at 92, 73 S.Ct. at 539.

*entine v. Strange,* 597 F.Supp. 1316 (E.D. Va.1984)). According to plaintiff, his right to personal security and safety "precludes the Department of the Navy from forcing him to serve under conditions that may exacerbate or accelerate his macular degeneration." *Id.*

The right to personal security and safety is well established in certain contexts, particularly school discipline, *Ingraham,* 430 U.S. at 673, 97 S.Ct. at 1413, and conditions of mental institutions. *Youngberg,* 457 U.S. at 309, 102 S.Ct. at 2454; *Valentine,* 597 F.Supp. at 1317. Plaintiffs have cited no case supporting the existence of such a right in the circumstances presented here, and the irony of the theory is not lost on the Court: while the Navy may order reservists to go where they might be killed, it may not order them to go where their eyesight might be harmed. Obviously a reservist without any special health needs would have no substantive due process claim in the context of a call-up to active duty. Plaintiff's interest in his personal safety does go beyond that of others called upon to take part in this or any war. However, plaintiff has not submitted any convincing reason to provide him a plenary determination of his physical qualifications to serve, as opposed to the procedural due process review the Court has already performed. Plaintiff's substantive due process claim is, in effect, that the Navy did not adequately consider the potential damage to his eyes. The Court has already determined to the contrary. *See generally, Brown v. McNamara,* 387 F.2d 150, 152–53 (3d Cir.1967) (arbitrary and capricious standard employed to review conscientious objector's substantive due process claim), *cert. denied sub nom. Brown v. Clifford,* 390 U.S. 1005, 88 S.Ct. 1244, 20 L.Ed.2d 105 (1968). To open plaintiff's claim to a plenary hearing would show little deference to the wartime needs of the military, regardless of the weight ultimately given military considerations.

▇ Finally, even assuming, *arguendo,* the real possibility that plaintiff may suffer accelerated impairment of his sight because of his duty assignment, the Navy's interest in assigning plaintiff to such a duty posting outweighs this possibility. The Navy needs plaintiff to examine the x-rays of injured soldiers. None of plaintiff's doctors has argued that plaintiff will lose his eyesight so quickly as to be unable to perform that critical function. The Court rejects plaintiff's substantive due process claim.

### C. Preliminary Injunctive Relief

Although the Navy has urged a heightened standard for a preliminary injunction in cases of review of military decision, the Court will assume without deciding that the general standard governs. To obtain a preliminary injunction, the moving party must show a likelihood of success on the merits and the probability of irreparable harm if relief is not granted. *Hohe v. Casey,* 868 F.2d 69, 72 (3d Cir.1989). Because Navy officers made a discretionary judgment within the scope of their authority, their judgment is unreviewable. Even if it is reviewable, the Navy's action was not arbitrary and capricious. The Court likewise rejects plaintiff's substantive due process claim. Therefore, plaintiff has no chance of success on the merits. The Court will not reach the issue of irreparable injury.

### III. CONCLUSION

Plaintiff's motion for a preliminary injunction will be denied.

An appropriate order is attached.

### ORDER

For the reasons set forth in the Court's Opinion filed herewith,

It is on this 25th day of January, 1991,

ORDERED that plaintiff's motion for a preliminary injunction is denied; and it is further

ORDERED that the Navy's order to transport plaintiff to the Persian Gulf area shall be stayed in the event plaintiff files an appeal to the Court of Appeals of the Third Circuit of this Court's denial of his motion for a preliminary injunction. Plaintiff shall request a continuation of this stay

from the Court of Appeals at the earliest opportunity. The stay ordered herein shall remain in force until January 28, 1991 at 10:00 a.m.